## State of Vermont v. Edward J. Siergiey

[582 A.2d 119]

No. 87-430

Present: Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.

Opinion Filed August 10, 1990

*Jeffrey L. Amestoy,* Attorney General, and *David E. Tartter,* Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Walter M. Morris, Jr.,* Defender General, *William A. Nelson* and *Henry Hinton,* Appellate Defenders, and *Sheila D'Amico,* Law Clerk (On the Brief), Montpelier, for Defendant-Appellant.

**Peck, J.** Defendant appeals his convictions of operating a motor vehicle while under the influence of intoxicating liquor, in violation of 23 V.S.A. § 1201(a)(2), and driving while his license to operate was suspended, contrary to the provisions of 23 V.S.A. § 674. His appeal rests on three claims: that the initial stop by the police that led to the charges was unlawful; that certain testimony by the arresting officer was improperly admitted at trial; and that the prosecutor's closing argument included facts not in evidence. We affirm.

## I.

Defendant first claims that the police officer's "stop" of his car violated his rights under the Fourth Amendment to the United States Constitution and Chapter I, Article 11 of the Vermont Constitution, in that it was not based on a reasonable and articulable suspicion that a violation of the motor vehicle laws

was taking place. See *State v. Boardman,* 148 Vt. 229, 231, 531 A.2d 599, 601 (1987). The pertinent facts are as follows. Officer Ernest Rheaume of the South Burlington police was contacted by another officer who had received a citizen complaint of an automobile being driven in an erratic manner; the complainant also provided the officer with the vehicle's registration plate number. Rheaume ran a registration check and learned the car was owned by defendant and that his address was on Simpson Court. He proceeded to the address and observed the car with the reported plate number on a side street travelling "extremely slowly." After the car turned onto Simpson Court, Rheaume turned around to follow and activated his blue light. The car did not stop but continued along Simpson Court and then pulled into the driveway at defendant's address. Rheaume pulled over and approached the vehicle on foot, noting, as defendant emerged from the car, obvious signs of intoxication. Defendant claimed later that he had not been aware of the police car or the flashing light until he got out of his car.

Defendant contends that the tip, although coupled with the observation of slow driving, was insufficient to constitute the reasonable suspicion required for an investigatory stop under the Fourth Amendment and Article 11. We disagree. Even assuming that activation of the cruiser's flashing light constituted a "stop" in the constitutional sense,* see *Michigan v. Chesternut,* 486 U.S. 567, 575–76 (1988) (no stop where police cruiser, without siren or flashing lights, followed alongside defendant running on sidewalk), we hold that the officer had reasonable grounds to take such measures.

■ In *State v. Kettlewell,* 149 Vt. 331, 335, 544 A.2d 591, 594 (1987), we said that the test "in evaluating the validity of an investigatory seizure . . . is 'whether, based upon the whole picture, [the agents] . . . could reasonably surmise that the particu-

---

* Once the officer approached the car on foot and observed the driver in person, his suspicions were reasonable, and defendant does not claim otherwise. He contends, however, that for constitutional purposes he was stopped prior to that encounter, and it is the grounds for that initial stop that he contests. In light of our disposition of the issue, we need not decide whether the officer's actions prior to the face-to-face encounter constituted a stop.

lar vehicle they stopped was engaged in criminal activity.'" (quoting *United States v. Cortez*, 449 U.S. 411, 421–22 (1981)). Investigatory stops are permitted where "specific and articulable facts which, together with the rational inferences taken therefrom, reasonably warrant the intrusion." *State v. Ryea*, 153 Vt. 451, 454, 571 A.2d 674, 675 (1990); see also *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *State v. Lambert*, 146 Vt. 142, 143, 499 A.2d 761, 762 (1985). The requisite "level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585 (1989). Defendant offers no reasons to adopt different principles under the Vermont Constitution.

■ ■ Here, the officer's "whole picture" included the specific facts of a citizen complaint of erratic driving, along with the vehicle's registration number, and the officer's own observation of the defendant driving "extremely slowly"—as the officer testified, 5 to 10 m.p.h. in a 35 m.p.h. zone. The tip was not anonymous (although Officer Rheaume did not himself know who had given it), and there were no special reasons to doubt its reliability. "Generally, information about criminal or suspicious activity from a citizen, who is not a paid informant and is unconnected with the police, is presumed to be reliable." *Kettlewell*, 149 Vt. at 336, 544 A.2d at 594. For purposes of this case, however, we need not determine whether the tip alone would justify a stop, nor whether the observation of "extremely slow" driving by itself would be sufficient. Taken together, the information available to the officer combined with his own observations was adequate to warrant an investigatory stop. Indeed, in *Lambert*, we upheld the validity of a vehicle stop where the officer, "lacking personal knowledge and observing no erratic behavior before the stop, based the stop solely on thirdhand hearsay." 146 Vt. at 143, 499 A.2d at 762. Certainly, courts have upheld investigatory stops on less information than was transmitted to and observed by Officer Rheaume. See, e.g., *State v. Czmowski*, 393 N.W.2d 72, 72–74 (S.D. 1986) (vehicle stop upheld where based on anonymous call that car was being driven erratically and only corroboration was finding described car in area) (citing cases).

## II.

Defendant next claims that the arresting officer's observations of his behavior and demeanor were disclosed at trial in violation of his right not to be compelled to incriminate himself. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Over objection, the officer testified that, during processing, the defendant was "abusive, arrogant, incoherent, very talkative, evasive." Defendant asserts that this evidence, albeit nontestimonial, should have been suppressed as a product of illegal police interrogation.

Even assuming that the officer's interrogation in this case violated defendant's *Miranda* rights, and that his observations of defendant's behavior and demeanor were thereby excludable—both questions we do not decide today—it is apparent from the record that the officer's testimony was solidly based on observations made both prior to any unlawful interrogation that might have occurred and during routine questioning for DUI booking. That questioning was not of an incriminatory nature and therefore not subject to the Fifth Amendment privilege. See *Pennsylvania v. Muniz*, — U.S. —, —, 110 S. Ct. 2638, 2650–51 (1990) (answers to routine booking questions designed to secure biographical data and incriminating statements made during officer's recitation of instructions for sobriety and breathalyzer tests need not be suppressed even though not preceded by *Miranda* warnings); *United States v. Gotchis*, 803 F.2d 74, 79 (2d Cir. 1986) ("Routine questions about a suspect's identity and marital status, ordinarily innocent of any investigative purpose, do not pose the dangers *Miranda* was designed to check . . . .").

Two examples of exchanges between the officer and defendant taped during his processing suffice to make the point clear. The transcript of the tape begins as follows:

| Cpl. Rheaume: | Okay Ed, this is the Miranda advice before we go any further. |
| Siergiey: | Do do do you know something. |
| Cpl. Rheaume: | Okay, before we go any further I want to explain these rights to you. |

Siergiey:          No no no I I I refuse those rights right now.

Cpl. Rheaume:    Well just listen to them.

Siergiey:          No no I know I know but but you didn't give me the Miranda rights you like at the beginning when you brought me in.

Cpl. Rheaume:    I'm giving them to you now.

Siergiey:          No no no I refuse to accept um.

Cpl. Rheaume:    Edward, listen.

Siergiey:          I refuse to accept um.

Cpl. Rheaume:    Now Edward, listen you have to cooperate. You may remain silent. Anything you say can be used against you in court. You may refuse to answer any questions asked of you at any time. If you cannot afford an attorney and want one you can contact a public defender or one will be contacted for you at the state expense before questioning. You have the right to have your attorney present during questioning. Do you understand these rights? Are you refusing to answer? You refuse to answer.

Siergiey:          Excuse me, excuse me I I didn't say anything.

Cpl. Rheaume:    Do you understand your rights?

Siergiey:          I I understand my rights.

Cpl. Rheaume:    Okay.

Siergiey:          Wait a second wait a second I I just want to say that you did not you know give me um you did not give me my Miranda rights when you first arrested me. Do you know that?

Conversation of the same tenor continued until, in response to the officer's question "What did you drink tonight?", defendant responded, "I will sustain the fifth, fifth amendment"—his first invocation of the right to remain silent.

The officer subsequently requested a breath sample from the defendant and tried to explain the consequences of refusal. He

then proceeded to collect biographical information, and asked the defendant about his mother's name.

| | |
|---|---|
| Cpl. Rheaume: | Her last name? |
| Siergiey: | Black, Blank. |
| Cpl. Rheaume: | That's her last name? Address? |
| Siergiey: | Her address uh 0 zero Street, Zero State Zero. I can't tell you all this. |
| Cpl. Rheaume: | Why? |
| Siergiey: | Because I think that my parents have a little privacy that they deserve. Am I so interesting that you have to you know like pick me up you know give me my court hearing in my yard. I went through you know— |

■ ■ The officer was not forbidden from testifying about his observations of defendant during these lawful exchanges. The trial court properly allowed the testimony.

### III.

■ Defendant's third and final claim is that the court improperly allowed prosecution argument based on facts not in evidence. In her closing argument, the prosecutor recounted Officer Rheaume's observations at the scene, and concluded: "Those are the things that the officer looks for as a result of the training—" Defense counsel objected, the court overruled the objection, and the prosecutor continued: "The officer testified that as a result of his training there are certain things that he looks for and those are the things that he was looking for that night." In fact, this comment did not mirror the officer's testimony; Rheaume had testified only that he had received training in the detection of typical signs of intoxication, not mentioning what those signs were. Even if the prosecutor's argument went beyond permissible bounds, we cannot imagine what possible prejudice it caused to defendant's case. The officer testified clearly that he was trained in the detection of intoxication and that defendant showed symptoms of intoxication, namely, odor of intoxicants on his breath, slurred speech, watery and bloodshot eyes, and swaying. We are confident beyond a doubt that

the jury was not affected by the prosecutor's assertedly unfounded statement that the symptoms Officer Rheaume in fact observed were those he was trained to observe. V.R.Cr.P. 52(a).

*Affirmed.*