2012 VT 53

**STATE of Vermont v. Nicole PARO**

[54 A.3d 516]

Nos. 11-184 & 11-185

¶ 1. July 10, 2012. This case presents a simple set of facts and a single question for review: whether a truck idling in the middle of the night in the parking lot of an auto repair shop that had previously been burglarized is sufficient to give police reasonable and articulable suspicion of criminal activity. We hold that this set of facts, without additional indicia of wrongdoing, is not enough to give an officer reasonable suspicion. We reverse.

¶ 2. Defendant Nicole Paro does not challenge the facts as found by the trial court; she challenges only the trial court's legal conclusion that, given the particular facts of this case, the police had reasonable and articulable suspicion to stop her vehicle. On appeal of a motion to suppress, we review the trial court's legal conclusions de novo and its factual findings for clear error. *State v. Pitts*, 2009 VT 51, ¶ 6, 186 Vt. 71, 978 A.2d 14.

¶ 3. The sparse record in this case reveals the following facts. A police officer with the Hartford Police Department was working the overnight shift on August 14, 2010. Prior to commencing a shift, officers receive a briefing which includes a "directive patrol list" — areas of concern to which police officers should pay extra attention. The list could include residential neighborhoods that have reported speeding vehicles, businesses that have experienced recent burglaries, or areas of known suspicious activity. The Hartford Police Department had received at least seven reports of thefts or burglaries at Northeast Foreign Cars and Collision Works (adjacent businesses on Route 4) between August 1997 and December 2009. Consequently, the area around these businesses was on the directive patrol list on August 14, 2010 when this incident took place.

¶ 4. The police officer in question was traveling east on Route 4 towards White River Junction at 12:43 a.m. when he passed by Northeast Foreign Cars and noticed a Chevrolet pickup truck idling in the parking lot. The police officer thought this was suspicious, as the shop was not open for business, and he knew that this area had experienced previous break-ins, with the most recent being about nine months earlier. In fact, the police officer had personally investigated thefts from vehicles at Northeast Foreign Cars a year earlier in August 2009. The officer pulled into a nearby motel's parking lot. As he started to turn around, the Chevy truck pulled out of the parking lot and headed east towards the police officer. The officer made a motor vehicle stop based solely on his suspicion of criminal activity at Northeast Foreign Cars. Defendant was charged with driving under the influence in violation of 23 V.S.A. § 1201(a)(2), and moved to suppress all evidence obtained through the traffic stop under the Fourth Amendment of the United States Constitution and Article 11 of the Vermont Constitution.

¶ 5. The trial court denied the motion to suppress, concluding that given the totality of the circumstances, the police officer had a reasonable and articulable suspicion of criminal activity when he stopped defendant's vehicle. The court reasoned that the police officer knew from prior personal investigations and from the directive patrol list that Northeast Foreign Cars had experienced thefts in the past, with three in the past year alone. Defendant was idling in the parking lot in the middle of the night and pulled out when the officer started turning around to investigate. The judge concluded that while there were plausible reasons for defendant's vehicle to have been in the parking lot at that hour, it was just as plausible that defendant was there for nefarious purposes. Accordingly, the court ruled that the facts in this case "rise to a higher level of particularity" than those in previous cases in which this Court held that the circumstances failed to establish a reasonable and articulable suspicion of criminal activity. See *State v. Warner*, 172 Vt. 552, 555, 773 A.2d 273, 276 (2001) (mem.) (ruling that defendant's proximity to attempted break-in, absent any other factors, does not give rise to reasonable suspicion); *State v. Welch*, 162 Vt. 635, 636, 650 A.2d 516, 518 (1994) (mem.) ("While information about criminal or suspicious activity from a citizen who is not a paid informant and is unconnected with the police may be presumed to be reliable, an investigatory stop may not be based

solely on the unsupported 'hunch' of an informant." (quotations and citations omitted)); *State v. Emilo*, 144 Vt. 477, 481, 479 A.2d 169, 171 (1984) (holding that officer's suspicion that vehicle "did not belong in the particular area in the early morning hours, without more, clearly falls outside of an 'articulable and reasonable' suspicion of some criminal wrongdoing").

¶ 6. Defendant renews her arguments on appeal. We begin by repeating our refrain that for a police officer to effect a warrantless traffic stop the officer must have a reasonable and articulable suspicion of criminal activity. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979); *State v. Crandall*, 162 Vt. 66, 70, 644 A.2d 320, 323 (1994). The officer must take into account the totality of the circumstances in deciding whether a stop is justified. *Warner*, 172 Vt. at 554, 773 A.2d at 275. "The level of suspicion required to justify a stop need not rise to the level required to prove guilt by a preponderance of the evidence, but it must be more than an inchoate and unparticularized suspicion or hunch." *Id.*

¶ 7. The facts of this case are most similar to those in *Emilo*, in which an officer was driving home late at night after investigating a report of a possible break-in. Nearing his home, as he traveled down a quiet dirt road on which he was "generally familiar with the residences," he observed a car he did not recognize. *Emilo*, 144 Vt. at 479, 479 A.2d at 170. The car was neither speeding "nor being operated in any unusual manner." *Id.* Based on nothing more than a "hunch" that this unknown vehicle was somehow tied to a crime, the officer stopped the car. *Id.* at 481, 479 A.2d at 171. We held this stop unconstitutional, as the officer "had no articulable and reasonable suspicion that the car he had stopped, or its occupants, were in any way connected or associated with any wrongdoing." *Id.* at 484, 479 A.2d at 173.

¶ 8. Comparing *Emilo* to the present case reveals a similar amount of informa-tion available to the police officers in assessing whether they had reasonable suspicion. In *Emilo*, the officer was returning home from a reported break-in in the middle of the night and was suspicious of an unknown vehicle on a quiet dirt road. In our case, the police officer knew that Northeast Foreign Cars had been the target of past criminal activity, though it had been many months since any wrongdoing had actually occurred there. The officer was not responding to a report of a break-in or an alarm; he had no reason to be particularly suspicious of a vehicle in the parking lot. Just as we held in *Emilo* that, because the suspect was not breaking the law or acting in an inherently unusual manner by driving down a back road in the middle of the night, the officer could not have had reasonable suspicion of criminal activity, we hold here that, because defendant was not doing anything illegal or inherently suspicious by idling in a parking lot, the officer had no cause to stop her.

¶ 9. A review of other cases leads to the same result. In *Welch*, an unknown informant approached three police officers and reported suspicious activity in a nearby area. 162 Vt. at 635, 650 A.2d at 517. The informant said that he saw an older Chevrolet pickup truck in a driveway, and people walking around the vehicle. When the informant went back for a second look, the truck was in a different driveway, and had unknown materials in the bed. No one was around the truck the second time. Police officers located the truck, followed it for two miles without observing any traffic violations or suspicious driving, and stopped it. This Court held that the informant's information was speculative, and did not adequately articulate a suspicion of specific wrongdoing. Most importantly, nothing "in the conduct of the driver as he was followed by the police suggested criminal activity." *Id.* at 636, 650 A.2d at 518. Police need to be suspicious to do their jobs properly,

and the police in *Welch* were well within their powers to follow up on the tip of suspected criminal activity. However, without observing any evidence of wrongdoing, the officer stepped beyond his constitutional limits by effecting a traffic stop. This is precisely the same line police officer stepped over in the present case.

¶ 10. *Warner* dealt with a motorist's actions that were arguably suspicious, yet we still found an unconstitutional stop. Two officers responded to a report of an attempted automobile break-in at night. One radioed to the other that a vehicle had been seen leaving the area of the crime. The pursuing officer located the suspect vehicle, began following it, called in the license plates, and learned that the driver was someone he had known since high school. The driver pulled off the road onto a driveway and turned off the headlights. He did not exit the vehicle. The police officer continued down the road and parked where he could keep the parked vehicle in sight. After a few minutes, the officer observed the car lights turn back on, and the car pulled back out on to the road and continued in the same direction it was originally traveling. The police officer effected a traffic stop. The officer testified he stopped the vehicle because "it was suspicious activity to me that — you know, maybe the operator had a reason to avoid me." *Warner*, 172 Vt. at 553, 773 A.2d at 275. We held that the stop was unconstitutional because, as in *Emilo*, "the officer had no basis other than the usual paucity of motor vehicle traffic on the streets in question to tie the defendant's car to the alleged crime." *Id.* at 555, 773 A.2d at 276. There was nothing illegal about any of the defendant's activities that the officer observed prior to the stop, and "[t]here are any number of lawful reasons why a person driving down a road would not want to be followed by a police officer." *Id.*

¶ 11. We see no reason why our holdings in *Emilo, Welch,* and *Warner* should not control here. Defendant's car was parked in an area that had previously experienced criminal activity, but it had been nine months since any crime was reported. She was not observed walking or snooping around the lot or otherwise acting in a suspicious manner; she was simply idling. And when she pulled onto the road, she did not drive away from the police officer in an attempt to elude him, but rather drove in his direction. While the officer may have been attempting to investigate the situation, his level of suspicion was not reasonable and articulable under the circumstances.

¶ 12. As the trial court noted, there are any number of plausible reasons why defendant may have been in the parking lot, from fixing a contact lens to making a phone call to looking at a map to dropping off her truck for service. Without additional indicia of wrongdoing — such as the type of particularized suspicion that could come from a very detailed tip, see *Alabama v. White*, 496 U.S. 325, ·330-32 (1990) (upholding stop based on a highly detailed and specific anonymous tip), a report of a recent break-in, see *Commonwealth v. Quinn*, 862 N.E.2d 769, 771 (Mass. App. Ct. 2007) (upholding stop of "the only motor vehicle on the road driving from the direction of a gasoline station break-in that had occurred five minutes earlier"), or direct observation of inherently suspicious circumstances, see *People v. Nonnette*, 271 Cal. Rptr. 329, 334 (Ct. App. 1990) (upholding stop based on observation of bundle of baggies similar to those used to package drugs in area with high drug traffic) — simply idling a car in a parking lot in the middle of the night where burglaries have previously occurred should not subject the driver to a police seizure.

¶ 13. At least one of our sister courts has reached a similar holding with virtually identical facts. In *State v. Butkovich*, an officer saw a car with two occupants parked at a closed fast-food restaurant at

two o'clock in the morning. 743 P.2d 752, 753 (Or. Ct. App. 1987). The officer knew of recent burglaries in the area and decided to approach the car. One passenger "got a very surprised look on her face," then bent over for several seconds and apparently put something under the seat. *Id.* The officer ordered everyone out of the car, reached under the seat, and found cocaine. The issue on appeal was "whether the officer's suspicion that [the occupants were] engaged in criminal activity was reasonable." *Id.* at 754. The court held that "there was nothing inherently suspicious about sitting in a vehicle in a parking lot at odd hours and that, without some evidence that a crime has in fact occurred, a surprised look and furtive movement do not support a reasonable suspicion of criminal activity." *State v. Moya,* 775 P.2d 927, 928 (Or. Ct. App. 1989) (summarizing *Butkovich*). The court therefore held that the stop was illegal. *Butkovich,* 743 P.2d at 754.

¶ 14. We recognize that police officers are trained to be suspicious and it is their job to investigate suspicious situations. But we must also be mindful of our right to wander where we please, when we please, without fear of a police seizure.

*Reversed.*